AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio 

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

4985 Warner Road, Apartment 102, Westerville, Ohio
43081, SUBJECT PREMISES 1,  AS MORE FULLY
DESCRIBED IN ATTACHMENT A-4

)
)
)
)
)
)

Case No. 2:25-mj-460

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1029 | Access Device Fraud |
| 18 U.S.C. 1956 | Money Laundering |
| 18 U.S.C. 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Meredith Williams*

*Applicant's signature*

Meredith Williams, SA Federal Bureau of Investigation

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: August 8, 2025

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Meredith Williams, a Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, state:

### INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises and people:

   a.     The premises known 3400 Valley Park Avenue, Columbus, Ohio 43231 (**SUBJECT PREMISES 1**), further described in Attachment A-2, and the person of **MAZEN MOHAMED HASSAN (MAZEN)**, further described in Attachment A-1.[1]

   b.     The premises known as 4985 Warner Road, Apartment 102, Westerville, Ohio 43081 (**SUBJECT PREMISES 2**), further described in Attachment-A-4, and the person of **YUSUF MOHAMED ALI (YUSUF)**, further described in Attachment A-3.

The requested warrants would authorize the seizure of the records, information, and items identified in Attachments B-1 and B-2.

2.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that **ABDULKADIR Ali, HUSSEIN Mohamed Ali, OMAR Mohamed Ali, AHMED Mohamed Ali, MAZEN, YUSUF, ABUBAKAR Mohamed Ali,** and **ABDIRAHMAN Abdalla Mahamed** (collectively, the "TARGET SUBJECTS"), and others have violated Title 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1029 (Access Device Fraud), 18 U.S.C. § 1956 (Money Laundering), and 18 U.S.C. § 371 (Conspiracy to Commit Wire Fraud)

---

[1] In accordance with Rule 41 of the Federal Rules of Criminal Procedure, warrants for ABDULKADIR's, HUSSEIN's, OMAR's, and AHMED's person and their residence are being sought in the Northern District of Georgia and the District of Oregon, whereas the warrants for MAZEN's and YUSUF's person and their residences are being sought in the Southern District of Ohio, ABUBAKAR's person and his residence are being sought in the Western District of Michigan, and ABDIRAHMAN's person and his residence are being sought in the Southern District of California.

(collectively, the "TARGET OFFENSES"). There is also probable cause to search **SUBJECT PREMISES 1, MAZEN, SUBJECT PREMISES 2**, and **YUSUF** for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

3. This request for a search warrant originates from an investigation into accusations that the TARGET SUBJECTS defrauded Shipt and Instacart in the total amount of approximately $30 million.

4. This affidavit is submitted for the limited purpose of securing search warrants. I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that violations of the federal laws identified above have occurred, and that evidence, fruits, and instrumentalities of these violations are located at **SUBJECT PREMISES 1 (MAZEN's** residence), and **SUJBECT PREMISES 2**, (**YUSUF's** residence), and on their person. I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by the victim organizations, information provided by other agents and law enforcement officers, and information provided by records and databases.

## AFFIANT BACKGROUND

5. I am employed as a Special Agent with the FBI and have been so employed since July 2022. I have been assigned to the San Francisco Field Office of the FBI, where I have been responsible for investigating complex financial crimes. As an FBI agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

6. In joining the FBI as a Special Agent, I initially spent 18 weeks at the FBI training academy in Quantico, Virginia, where I received training in a variety of investigative and legal matters, including the topics of drafting complaint affidavits, confirmation of probable cause, and arrest procedures. During my tenure as a Special Agent, I have participated in numerous criminal investigations and have received extensive training in the investigation of

financial crimes. Prior to joining the FBI, I worked at a tier one automotive supplier as a Mechanical Engineer for four years.

7.     I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including wire fraud, securities fraud, conspiracy, and obstruction of justice.

## APPLICABLE STATUTES

8.     **Title 18, United States Code, Section 371**, provides, in relevant part, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years or both."

9.     **Title 18, United States Code, Section 1343**, provides, in relevant part, that an individual violates federal criminal law if he or she "devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice."

10.     **Title 18, United States Code, Section 1029,** provides, in relevant part, that an individual violates federal criminal law if he or she "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period and by such conduct obtains anything of value aggregating $1,000 or more during that period."

11.     **Title 18, United States Code, Section 1956,** provides, in relevant part, that an individual violates federal criminal law if he or she "knowingly transact in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

3

## FACTS SUPPORTING PROBABLE CAUSE

**A.** **Overview**

12.     The United States Secret Service ("USSS") and the FBI are investigating **ABDIRAHMAN Abdalla Mahamed, OMAR Mohamed Ali, AHMED Mohamed Ali, MAZEN Mohamed Hassan, ABDULKADIR Ali, HUSSEIN Mohamed Ali, YUSUF Mohamed Ali, ABUBAKAR Mohamed Ali**, and others (collectively, the TARGET SUBJECTS), for potential violations of the wire fraud statute, access device fraud statute, money laundering statute, and conspiring to commit those violations. As discussed below, there is probable cause to believe that the TARGET SUBJECTS devised and executed a scheme to take over Maplebear Inc. (d/b/a Instacart) ("Instacart") and Shipt shopper accounts in order to purchase gift cards from retailers and convert those gift cards to cryptocurrency and cash.

13.     As detailed below, there is probable cause that the TARGET SUBJECTS used their telephones to further their fraudulent scheme, including by creating customer accounts on Shipt and Instacart's platforms, communicating with other co-conspirators, using cryptocurrency exchanges to obtain and transfer fraudulent funds, among other things. The warrant sought authorizes the seizure of devices and other evidence items.

**B.**     **Relevant Individuals and Entities and Background**

14.     During the conduct described herein, Instacart was a U.S. based delivery company, headquartered in San Francisco, California, that operated a grocery delivery and pick-up service in the United States and Canada and was accessible via their website or mobile application.

15.     During the conduct described herein, Shipt was a U.S. based delivery service owned by Target Corporation and headquartered in Birmingham, Alabama. Shipt facilitated delivery from various retailers to its members via their website or mobile application.

16.     During the conduct described herein, Marqeta was a card issuing and processing platform with headquarters in Oakland, California. Marqeta was the credit card processing server for Instacart.

4

17. During the conduct described herein, Stripe was an American multinational financial services company with headquarters in South San Francisco, California and Dublin, Ireland. Stripe was the credit card processing server for Shipt.

18. As part of both Instacart's and Shipt's platform, customers order groceries from participating retailers who are in the same approximate location as the customer. Once a customer places an order, Instacart and Shipt verify that the customer's linked payment method can be charged. Then, a shopper, who is also in the same relative area as the retailer and thus the customer, accepts the order and becomes the customer's personal shopper. Once the shopper accepts the order, funds are issued on a physical debit card or a digital debit card (via Stripe for Shipt and Marqeta for Instacart) straight to the shopper's telephone. Instacart and Shipt both allow the customer to alter the order after the shopper has accepted the order but prior to the shopper beginning the shopping process. When a customer adds items to the order, Instacart and Shipt do not conduct a secondary check to ensure the customer's payment method can be charged for the new amount. The shopper's digital debit card balance is updated based on the new total. Customers and shoppers are able to communicate within the Instacart and Shipt platforms. The shopper then picks, packs, and delivers the customer's order. A customer is able to cancel their order for free, prior to the shopper beginning the shopping process. A customer can cancel their order after the shopping has occurred while the delivery is in progress and the customer will receive a full refund with the potential of having a cancellation fee. Instacart and Shipt both have policies where a customer cannot order gift cards using their platforms and shoppers cannot purchase gift cards for the customers.

19. In order to become a Shipt or Instacart shopper, one needs to be 18 years old, have a valid U.S. driver's license, have a reliable vehicle that is a 1997 model or newer, have knowledge of produce selection, have the ability to lift 40-50 pounds, possess a smartphone capable of running the Shipt or Instacart app, and pass a background check on their driving and criminal records.

20. In order to be a Shipt or Instacart customer, one can either have a Shipt or

5

Instacart membership, or can order through the Shipt or Instacart application and pay a delivery fee. To become a Shipt or Instacart member, one must pay a $99 yearly fee and sign up using their email or phone number.

### C.   Overview of the TARGET SUBJECTS Scheme

21.     Between approximately November 2022 and present, ABDIRAHMAN, OMAR, AHMED, MAZEN, ABDULKADIR, HUSSEIN, YUSUF, ABUBAKAR, and potentially others unknown, conducted a scheme to take over Instacart and Shipt shopper accounts in order to purchase gift cards from retailers like Target and Kroger utilizing the funds loaded onto the shopper's debit card. The TARGET SUBJECTS then purchased cryptocurrency with the gift cards and then converted the cryptocurrency to cash. To date, Instacart has reported a loss of approximately $16,162,295 and Shipt has reported a loss of approximately $14,300,000 related to this scheme.

22.     Throughout the scheme, the TARGET SUBJECTS compromised 5,522 Instacart Shopper accounts and completed transactions in forty-eight states including conducting approximately 4,051 transactions in the state of California. Throughout the scheme, the TARGET SUBJECTS compromised approximately 2,215 Shipt shopper accounts and completed transactions in numerous states, including Georgia.

23.     Based on a review of data provided by Instacart and Shipt and conversations with both victims, the TARGET SUBJECTS began their scheme by obtaining a list of active and inactive shopper accounts and contact information for these shoppers on both platforms. The TARGET SUBJECTS then reached out to these inactive and active shoppers via text message or phone call purporting to be Shipt and Instacart. The TARGET SUBJECTS contacted these shoppers and asked them if they would like to remain shoppers or if they would like to deactivate their accounts. If the shopper wanted to no longer be active on Shipt or Instacart, the TARGET SUBJECTS sent a message to the real shopper requesting them to send a one-time code that was sent to the real shopper's phone to discontinue their accounts. Simultaneously, it is believed that the TARGET SUBJECTS requested a reactivation of the shopper's account using the real

6

shopper's contact information. This reactivation requested a one-time, six-digit code that was sent to the real shopper's phone number. When the shopper provided the code that Shipt or Instacart sent them, the TARGET SUBJECTS then entered this code into their devices and thus had end to end access of the shopper's account. As part of the investigation, law enforcement sent a subpoena to Shipt. As a result of the subpoena, Shipt provided examples of the phishing text messages as shown below.



*Figure 1: Shipt Phishing Text Messages*

24.     If the shopper wanted to continue shopping with Shipt and Instacart, the TARGET SUBJECTS would request the one-time code in order to reactivate those shoppers'

7

accounts. When the shopper provided the code that Shipt or Instacart sent them, the TARGET SUBJECTS then entered this code into their devices and thus had end to end access of the shopper's account. As part of the investigation, Shipt provided examples of the phishing text messages as shown below.



*Figure 2: Shipt Phishing Text Messages*

25. Additionally, as part of the investigation, Instacart, by way of subpoena, provided the below phishing report submitted by a customer.

*Figure 3: Instacart Phishing Report*

26. Once the TARGET SUBJECTS had access to the shopper accounts, the TARGET SUBJECTS then placed fictitious grocery orders using Shipt and Instacart applications. The TARGET SUBJECTS, acting as the shopper, accepted these fictious orders. Once the order was accepted and Shipt and Instacart verified funds were in the customer's account, the TARGET SUBJECTS added items to increase the value of the order. As stated above, a secondary check of customer funds was never conducted. The funds to purchase the order were then loaded onto the shopper's account digital debit card, which the TARGET SUBJECTS had full ownership of. The TARGET SUBJECTS then, acting as the shoppers, went to the store. Instead of purchasing the grocery items listed, the TARGET SUBJECTS purchased gift cards. Simultaneously, the TARGET SUBJECTS cancelled the customer order and were issued a refund for their customer order.

27. After obtaining gift cards from the stores, the TARGET SUBJECTS then either purchased cryptocurrency and converted the cryptocurrency to the U.S. Dollar through cryptocurrency exchanges or used other nefarious ways to convert like selling crypto for cash through the U.S. Postal Service. Alternatively, the TARGET SUBJECTS used the gift cards to complete online orders for their own benefit.

9

28.    Based on my review of Shipt and Instacart data, the TARGET SUBJECTS employed another method to take over accounts. In this account takeover methodology, the TARGET SUBJECTS first placed an order through Shipt or Instacart. Once the order was placed and a shopper accepted the order, the TARGET SUBJECTS then reached out to the shopper via the Shipt or Instacart application and requested the shopper to call them because they needed to add items to the order. Once the shopper called the TARGET SUBJECTS, the TARGET SUBJECTS then had the victim shopper's telephone number. The TARGET SUBJECTS then posed as a Shipt or Instacart employee. The TARGET SUBJECTS then requested the victim shoppers to send them the legitimate security code sent via text message from Shipt or Instacart. The TARGET SUBJECTS then utilized this code to access the victim shopper's account. After this, the TARGET SUBJECTS then had end to end control of the shopper's account and the TARGET SUBJECTS added goods to the initial order. The shopper's debit card amount then increased and the TARGET SUBJECTS utilized the shopper's debit card funds to go to the store and purchase gift cards. Simultaneously, the TARGET SUBJECTS acting as the customer cancelled their initial order and received a refund from Shipt and Instacart for that order. As part of the investigation, Instacart provided the below chat examples and phishing report.



Chat between customer and shopper for the delivery Walgreens

| gerold5321 | May 16, 12:31 AM |
| hi belous can you call me it's urgent | |

| gerold5321 | May 16, 12:31 AM |
| 256-455-0049 | |

| gerold5321 | May 16, 12:35 AM |
| i'm adding items one sec | |

| gerold5321 | May 16, 12:44 AM |
| | |

| gerold5321 | May 16, 12:44 AM |
| | |

| gerold5321 | May 16, 12:44 AM |
| | |

*Figure 4: Instacart Phishing Chat*

**Vincent Poulter**  June 4, 2023 at 09:42

secure_full_name: Samantha Petty-Adams
secure_mail: Samandblack13@gmail.com
secure_phone_number: 2624843760
secure_issue: Report a phishing scheme:
secure_subject:
secure_description: I had missed a call and then I received a messages from someone named Charles who said they were with instacart support team. I had call the number back and a guy named Charles answered it and said that a customer had made a report saying the person on the profile picture didn't match the person who dropped off which that was a lie. He had me do the verification process. Then he said that it would not go threw but it went threw on my end and had me do it again. Then he said it still didn't go throw for me to change my profile picture and I did. Then he told me to put this number in where I would put my number to log in and I did and it would send him the verification code and he would give it to me to put in and I did. He told me instacart would pay me $130 since my account was locked and I couldn't work. Then he said he would have to have someone look into the account because he don't know why it will nope verify my account. Never received a call back so I had call instacart a few hours later to find out what was going on and why I couldn't get on my account and they said they couldn't verify me because none of my information had match anything on their records.
secure_most_recent_account_access: Friday May 26th
secure_can_login_to_account: No

*Figure 5: Instacart Phishing Report*

### D. **Target Discovers TARGET SUBJECTS Fraudulent Scheme**

29.     At some point during the scheme, Target noticed that the TARGET SUBJECTS were purchasing gift cards using Shipt debit cards. This was against Shipt's policy and Target began to investigate. Target conducted surveillance at several store locations where the TARGET SUBJECTS were observed purchasing gift cards with Shipt shopper debit cards. Through Target's store surveillance, **ABDIRAHMAN, OMAR, AHMED, MAZEN, ABDULKADIR, HUSSEIN, YUSUF**, and **ABUBAKAR** were observed using self-checkout to purchase gift cards utilizing Shipt debit cards.

a.      On September 27, 2023, **ABDIRAHMAN** and **OMAR** were observed entering four separate Georgia Target store locations including Johns Creek, Cobb NE, Roswell, and Alpharetta. At each of these stores, **ABDIRAHMAN** and **OMAR** purchased approximately 27 Target gift cards totaling approximately $10,954.40. The below pictures depict **ABDIRAHMAN** and **OMAR** purchasing gift cards using the self-checkout at the Johns Creek Target location and exiting the store after purchasing gift cards.



*Figure 6: OMAR (right) and ABDIRAHMAN (left) purchase gift cards at the Johns Creek Target Location*



*Figure 7: OMAR (left) and ABDIRAHMAN (right) exit the Johns Creek Target Location*

b.     On September 28, 2023, **ABDULKADIR** was observed entering and exiting two different Georgia Target store locations, Suwanee Peachtree and Buford, with **AHMED** and **MAZEN**. At both locations, **ABDULKADIR, AHMED,** and **MAZEN** can be seen on video surveillance purchasing approximately four gift cards at the Suwanee Peachtree location and eight gift cards at the Buford location totaling approximately $2,760 in value. The below pictures depict **ABDULKADIR, AHMED,** and **MAZEN** at the self-checkout of the Buford Target location during the purchase of the gift cards (top) and exiting the Buford Target location (bottom) after the purchase of the gift cards.



*Figure 8: AHMED (left), MAZEN (middle) and ABDULKADIR (right) purchase gift cards at the Buford Target Location*



*Figure 9: ABDULKADIR (front), AHMED (back right), and MAZEN (back left) exit the Buford Target Location*

c.    Additionally, the next day, on September 29, 2023, surveillance video from the Lawrenceville Target store location recorded **ABDULKADIR** entering and exiting the store and attempting to purchase a $350 gift card. This transaction was denied. The picture below depicts **ABDULKADIR** exiting the Lawrenceville Target location after attempting to purchase the $350 gift card.

13



*Figure 10: ABDULKADIR exits the Lawrenceville Target Location*

d.        On September 29, 2023, **HUSSEIN** was observed entering and exiting two different

Georgia Target store locations including Buford and Lawrenceville. Surveillance video from the

Buford Target store location recorded **HUSSEIN** attempting to purchase a $400 gift, but the

transaction was denied. Additionally, surveillance video form the Lawrenceville Target store

location recorded **HUSSEIN** purchasing approximately two gift cards at the Lawrenceville

location totaling approximately $600.



*Figure 11: HUSSEIN exits the Lawrenceville Target Location*

e.        On June 2, 2024, surveillance footage at the N. Druid Hills Target store location recorded

**HUSSEIN** and **OMAR** entering and exiting the store and purchasing three gift cards totaling

approximately $1,324.26. Additionally, on June 9, 2024, **HUSSEIN** and **OMAR** were observed

entering and exiting the Lawrenceville, Georgia Target location and purchasing approximately

14

two gift cards in the amounts of approximately $490.84 and $489.67. The below pictures depict **HUSSEIN** exiting the Lawrenceville Target location and **HUSSEIN** and **OMAR** exiting the N. Druid Hills location after the purchase of the gift cards.



*Figure 12: HUSSEIN (left) and OMAR (right) exit the N. Druid Hills Target Location*

      f.      On September 30, 2023, surveillance video captured **YUSUF** entering and exiting the Peachtree, Georgia Target location. **YUSUF** purchased approximately three gift cards at the Peachtree, Georgia Target location totaling approximately $1,320 in value. On November 9, 2023, surveillance video captured **YUSUF** entering and exiting the Buford, Georgia Target location and purchasing approximately three gift cards totaling approximately $705. On December 6, 2023, surveillance video captured **YUSUF** entering and exiting the Atlanta Perimeter Target location and purchasing approximately eight gift cards totaling approximately $3,940. On December 7, 2023, surveillance video captured **YUSUF** entering and exiting the Atlanta Perimeter Target location and purchasing two gift cards totaling $980. On December 11, 2023, surveillance video captured entering and exiting the Atlanta Perimeter Target location and purchasing approximately six gift cards totaling approximately $2,970. Below are still frames from video surveillance from the Buford Target location on November 9, 2023 depicting **YUSUF** purchasing the three gift cards and exiting the Buford Target location after purchasing the three gift cards:

15



*Figure 13: YUSUF purchases gift cards at the Buford Target Location on November 9, 2023*



*Figure 14: YUSUF exits the Buford Target Location on November 9, 2023*

  g.  On October 1, 2023, **AHMED** and **MAZEN** were observed entering two different Georgia Target store locations at Cobb NE and Roswell. At both locations, **AHMED** and **MAZEN** purchased approximately 26 gift cards totaling approximately $6,090 in value. The below pictures depict **AHMED** and **MAZEN**, on two separate occasions, exiting the Roswell Target location after purchasing gift cards. The pictures were captured from video surveillance at the Roswell Target location.

16



*Figure 15: MAZEN (left) and AHMED (right) exit the Roswell Target Location on October 1, 2023*

h.        On October 31, 2023, **ABUBAKAR** is observed on video surveillance exiting the Buford Target location at approximately 3:40 PM in the Eastern Time Zone. That same day, someone purchased approximately two gift cards, each in the amount of $150, from the Buford Target location at 3:39 PM in the Eastern Time Zone. However, no video existed at the terminals at the time of the transactions. On October 31, 2023, the Buford Target location transaction receipts showed that someone purchased approximately three gift cards, each in the amount of $150, at approximately 3:33 PM in the Eastern Time Zone and 3:34 PM in the Eastern Time Zone. Based on the pattern of the scheme, there is probable cause that **ABUBAKAR** was the purchaser of the gift cards at 3:39 PM in the Eastern Time Zone. The picture below depicts **ABUBAKAR** exiting the Buford Target location after purchasing gift cards.



*Figure 16: ABUBAKAR exits the Buford Target Location on October 31, 2023*

30. In the video footage that Target recorded, the TARGET SUBJECTS can be seen utilizing Shipt and Instacart shopper digital debit cards located on their cellular telephones to purchase these gift cards. The surveillance video depicts both Shipt and Instacart logo debit cards on the TARGET SUBJECTS telephones to purchase the gift cards. Additionally, data received from both Shipt and Instacart during the investigation shows that Shipt and Instacart digital debit cards were swiped at the same time in the same amount as the TARGET SUBJECTS transactions.

31. Target provided video surveillance from their parking lots from the time the fraudulent gift card purchases were occurring. From these videos, I observed several cars that the TARGET SUBJECTS exited prior to purchasing the gift cards and entered after purchasing gift cards. These vehicles included a Toyota Camry registered to **ABDULKADIR** and a Honda Civic registered to **HUSSEIN**. Based on surveillance reports from Target, they have observed the **TARGET SUBJECTS** using rental vehicles.

32. Additionally, during Target's own investigation, they received a cyber tip from the email address anisamohamed0325@gmail.com. The tip outlines the scheme and identifies the TARGET SUBJECTS as the perpetrators of the scheme. The cyber tip is pictured below:

Original Sender Email: anisamohamed0325@gmail.com
Time/Date Received (timestamp): 11/3 3:07pm

I have information they are about go hit Kroger within a couple of hours. YOu guys need to get
facial scan recognition like instacart did. They had the same problem, and once they added ID
and Face Verification the problem was solved for them.

Abdulkadir Ali, Abubakar Ali, Hussein Ali, Ahmed Ali,Yusuf Ali, Omar Ali, Abidrahman Mohamed
and Mazen Hassan. ( individuals)

I am not sure of exact location, They are a group of brothers and cousin's, nephews, etc. I
spotted them one day and started observing them for a while on social media. There is a SHipt
and Instacart scam going around, if you want to know more details about that then google online
but they are comminting all kinds of frauds. Usually at Target or Krogers in the Whole Atlanta
Area. including bufford, lawrenceville, etc. What they are doing is using shipt accounts to go buy
Target gift cards hence they are scamming shipt and instacart. There was also messages on
reddit and places on how people are getting hacked out of their drivers accounts and then
fraudsters used it it gets banned.

522MXX its an Oregon plate. THey mostly driver vehicles with California Plates.
One of the Vehicles had an Oregon plate numbers
SOmetimes they go to different states and cities, Charlotte, Kentucky, Missouri, San Diego, etc
etc either Target or Harris Teeters or Kroger
With Vehicles plate number 522MXX Oregon plate and (9DF-M493 CA Plate

Their address seems to be
4025 McGinnis Ferry Rd
Suwanee, GA 30024
APT B14-1425
3956 Harvest Ridge Lane NE Bufford, GA

Some of their social media profiles
  https://www.facebook.com/profile.php?id=100000975494834
  https://www.facebook.com/tubaka.shicum
  https://www.instagram.com/nftaych/
  https://www.instagram.com/omar_1911/
  https://www.instagram.com/baba_b0y_/
  https://www.instagram.com/baba_g24/

*Figure 17: Cyber Tip email from anisamohamed0325@gmail.com*

### E. UCE communication

33.    As part of the investigation, an FBI Under Cover Employee ("UCE") was in

communication with **ABDULKADIR** via Telegram Messenger ("Telegram"). Telegram is a

cloud-based, encrypted instant messaging service. Telegram allows Android and Apple users to

exchange messages, media files, and host video calls. Telegram allows users to set up public

usernames which allows other users to find a person via their username. **ABDULKADIR's**

username was Bazi.

34.    On October 23, 2023, the UCE and **ABDULKADIR** messaged via Telegram.

Unsolicited, **ABDULKADIR** informed the UCE about his Shipt and Instacart scam.

Specifically, **ABDULKADIR** writes as Bazi to the UCE:

16:17 "I'm good just hustling etc etc went on the road for a bit!"

16:19 "Nah man some fast money moves not drugs though."

16:21 "You heard of shipt?" "You heard of Instacart?"

16:22 "Anyways they're a grocery delivery company."

16:24 "Short version got a way to cash out from them but it's kinda of dying out now so trying to get as much money as I can from them cause I'm still like 100k in debt."

16:25 "They give you a preloaded card basically to drivers."

16:27 "There's people who sell lists of inactive drivers from their platform you call them and get access to their account. Afterwards you take the preloaded card and get gift cards."

35.    The UCE then stated at 16:27, "I see and sell those for crypto and then crypto to cash." At 16:28 **ABDULKADIR** responded and stated, "Yup." :

36.    The UCE questioned what gift cards **ABDULKADIR** purchases and **ABDULKADIR** responded that he purchases Target gift cards.

**F.  TARGET SUBJECTS Used Telephones to Perpetrate the Scheme**

37.    Target informed me that the TARGET SUBJECTS utilized their devices to complete the gift card transactions at each Target location, and that these transactions were captured on surveillance video. I reviewed video surveillance provided by Target. In the videos obtained from Target's self-checkout terminals, I observed that **ABDIRAHMAN, OMAR, AHMED, MAZEN, ABDULKADIR, HUSSEIN**, and **YUSUF** all utilized their telephones in order to purchase the gift cards.

a.    On September 27, 2023, **ABDIRAHMAN** utilized his telephone to pay for one of the gift card transactions at the Johns Creek Target location as depicted below.

20



*Figure 18: ABDIRAHMAN (left) using cellphone to pay for transaction at Johns Creek Target*

       b.    On September 27, 2023, **OMAR** utilized his telephone to pay for one of the gift card transactions at the Johns Creek Target location as depicted below.



*Figure 19: OMAR (left) using cellphone to pay for transaction at Johns Creek Target*

       c.    On October 1, 2023, **AHMED** utilized his telephone to pay for one of the gift card transactions at the Roswell Target location as depicted below.



*Figure 20: AHMED (left) using cellphone to pay for transaction at Roswell Target*

21

d.      On October 1, 2023, **MAZEN** appeared to unlock and hand a telephone that was in his possession to **AHMED**. **MAZEN** then began to use the self-checkout machine at the Roswell, Georgia Target location to purchase gift cards. The telephone that **MAZEN** unlocked and handed to **AHMED** was utilized to purchase several gift cards. **MAZEN** handing his telephone to **AHMED** is depicted below.



*Figure 21: MAZEN (right) unlocking cellphone to use to pay for transaction at Roswell Target*

e.      On November 6, 2023, **ABDULKADIR** utilized his telephone to purchase several gift cards at the Atlanta Perimeter Target location as depicted below.



*Figure 22: ABDULKADIR using cellphone to pay for transaction at Atlanta Perimeter Target*

f.      On September 29, 2023, **HUSSEIN** utilized his telephone to attempt to purchase a gift card at the Buford, Georgia Target location as depicted below.



*Figure 23: HUSSEIN using cellphone to pay for transaction at Roswell Target*

g.    On November 9, 2023, **YUSUF** utilized his telephone to purchase several gift cards at the Buford, Georgia Target location as depicted below.



*Figure 24: YUSUF using cellphone to pay for transaction at Buford Target*

## G. CONNECTION TO DIGITAL DEVICES

38.    The warrant requested authorizes the search of **MAZEN** and **YUSUF's** person and respective residences for records stored in whatever form, including digital. And, as mentioned, I believe that **MAZEN** and **YUSUF** will have records relating to the scheme to

23

defraud Shipt and Instacart, including in the form of receipts, communications, and digital debit cards.

39.     There is probable cause that **MAZEN** is the user of Target Telephone 1 which has the assigned call number (619) 874-6660. According to business records obtained from T-Mobile on or about February 4, 2025, Target Telephone 1 is an active T-Mobile telephone number. MAZEN is the listed subscriber of Target Telephone 1's account. Additionally, in July 2023, MAZEN submitted an application for an apartment in Suwanee, Georgia and listed Target Telephone 1 as his telephone number. Furthermore, based on information received from Early Warning Services, LLC ("Zelle"), **MAZEN** has received money from some of the TARGET SUBJECTS and the number associated with the Zelle transfers is Target Telephone 1.

40.     There is probable cause that **YUSUF** is the user of Target Telephone 2 which has the assigned call number (619) 464-6996. Based on my review of records, I believe that **YUSUF** is the primary user of Target Telephone 2. Based on a review of **YUSUF's** application and lease records at The Residences on McGinnis Ferry, where **YUSUF** resided between June 2023 and May 2025, **YUSUF** listed Target Telephone 2 as his telephone number. **YUSUF** also listed his email address on his application as yusuf.ali0524@gmail.com. Based on a review of Google account records affiliated with the email address yusuf.ali0524@gmail.com, **YUSUF** was listed as the subscriber for this email address and I believe **YUSUF** uses this email address. Furthermore, according to Google account records, Target Telephone 2 is listed as the recovery phone number for the email address, yusuf.ali0524@gmail.com. Additionally, the government obtained records from Apple for accounts affiliated with **YUSUF**. **YUSUF's** Apple accounts listed Target Telephone 2 as the day phone or verified phone for each of his accounts. **YUSUF** has used Verizon as a service provider for Target Telephone 2 since at least March 2025.

## H.  PROBABLE CAUSE TO SEARCH SUBJECT PREMISES 1 AND 2

41.     The requested warrant authorizes a search of **SUBJECT PREMISES 1** for records, which is where **MAZEN** primarily resides, and **SUBJECT PREMISES 2**, which is where **YUSUF** resides.

42.     Open-source database checks show that **MAZEN's** listed address is **SUBJECT PREMISES 1**. Additionally, information was obtained from Google, LLC ("Google") which showed that **MAZEN's** location was in the vicinity of **SUBJECT PREMISES 1** for multiple days in a row in 2023 and 2024. Furthermore, the government conducted surveillance on **SUBJECT PREMISES 1** and on multiple occasions placed a Black Kia Optima with the California License Plate 9NJH143 parked in the driveway. The government obtained a warrant for **ABDULKADIR's** Google accounts and found an email from **ABDULKADIR** to **MAZEN** that contained an Ohio identification insurance card for the Black Kia Optima and **MAZEN** was listed as one of the insured drivers and the car was registered at **SUBJECT PREMISES 1**. Furthermore, based on my training and experience, I know that people tend to keep mobile phones on their persons, and that the location of mobile phones typically provides strong evidence of the location—and regular places of residence and business—of the phone's owner. A search warrant was served on T-Mobile for **MAZEN's** primary telephone number, and the location of that telephone has been in the relative area of **SUBJECT PREMISES 1**, primarily at nighttime when a person would typically be getting ready for bed and in the morning hours when a person would be waking up and getting ready for the day. Therefore, there is probable cause to believe that **MAZEN's** permanent residence is **SUBJECT PREMISES 1**.

43.     Open-source database checks show that **YUSUF's** listed address is **SUBJECT PREMISES 2**. Additionally, information was obtained from the Fairmont Luxury Apartments Complex, the apartment complex that **SUBJECT PREMISES 2** is part of, and **YUSUF** filled out an application for **SUBJECT PREMISES 2** on or about June 5, 2025. In addition, in communicating with the Fairmont Luxury Apartments staff, it was confirmed that **YUSUF** resides at **SUBJECT PREMSIES 2**. Furthermore, based on my training and experience, I know that people tend to keep mobile phones on their persons, and that the location of mobile phones typically provides strong evidence of the location—and regular places of residence and business—of the phone's owner. A search warrant was served on Verizon for **YUSUF's** primary telephone number, and the location of that telephone has been in the relative area of **SUBJECT**

25

**PREMISES 2**, primarily at nighttime when a person would typically be getting ready for bed and in the morning hours when a person would be waking up and getting ready for the day. Therefore, there is probable cause to believe that **YUSUF's** permanent residence is **SUBJECT PREMISES 2**.

44.     Based on my investigation, I believe that evidence of the TARGET OFFENSES is stored in digital form, in the form of, communications, receipts, debit cards, and applications like Instacart and Shipt.  I further believe from the investigation that these items will be located in messages, which are routinely stored on and accessed from individuals' digital devices, including their laptops, tablets (including iPads), and cellphones.  Here, I believe that **MAZEN's** and **YUSUF's** digital devices – including, in particular, their cellphones – will contain evidence of the TARGET OFFENSES, and that those digital devices will be located at both of their homes (**SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**) and on their persons.  I know from training and experiences that a person's digital devices are stored at their residence and on their persons; cellphones, in particular, are routinely in a person's actual possession.  As referenced, this warrant authorizes not only the seizure of digital devices but also their search.

### INFORMATION ABOUT EVIDENCE LIKELY TO BE FOUND ON DIGITAL DEVICES IN THE POSSESSION OF MAZEN AND YUSUF BASED ON MY TRAINING AND EXPERIENCE

45.     Based on my training and experience, there is probable cause to believe that evidence will be found on digital devices in the possession of **MAZEN** and **YUSUF**. Individuals who engage in wire fraud tend to possess documents and records reflecting their fraudulent activities, including text message communications, chat messages, wire transfer receipts, and other documents.  Such documents and records are generally maintained in digital form where individuals who engage in this conduct can readily access them.  Because digital devices are typically compact and portable, individuals who engage in white collar crimes often maintain devices containing evidence on their person or in their cars, backpacks, bags, or similar

26

containers because they need to access the information on those devices while on the go.

46.     Individuals who engage in wire fraud, mail fraud, and conspiracy to commit wire fraud and mail fraud often communicate with others who aid, participate, or are involved in the same fraudulent activity. Such communications are often conducted and stored on digital devices. In addition, individuals who engage in wire fraud and mail fraud often use their digital devices to communicate with co-conspirators by phone, text, email, and social media. Such digital devices are generally maintained in places where individuals who engage in bank fraud can readily access them.

47.     Furthermore, based on my training and experience, I know that cellphones often contain records of activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over messaging applications.

48.     Based on my training and experience, there is probable cause to believe digital devices in the possession of **MAZEN** and **YUSUF** will contain direct and indirect evidence and fruits of their criminal activities. For example, it is typical for fraudsters to use digital devices to communicate about the overall fraudulent scheme via messaging systems. I believe that their cellphones will contain evidence of the TARGET OFFENSES for the aforementioned reasons.

49.     Moreover, I know from training and experience that cellphone data is routinely backed up to other devices, including but not limited to iPads or other tablets and laptops. For the reasons mentioned above, I believe that iPhones were used to carry out the TARGET OFFENSES, and as a result, evidence of the TARGET OFFENSES exist on other digital devices, including laptops and tablets.  I also know from the investigation that emails were exchanged in order to carry out the TARGET OFFENSES, and that the emails are exchanged using digital devices like cellphones, laptops, and tablets.  I know this digital evidence exists until it is deleted.  And, here, there's no indication such evidence has been deleted.

## BIOMETRIC ACCESS TO DEVICES

50.     The passcodes or passwords that would unlock and access **MAZEN's** and

**YUSUF's** devices are not known to law enforcement.  Thus, it may be necessary to have the user

of the devices – in this case **MAZEN** and **YUSUF**– use a finger, a scan of the face, or a scan of

the iris, to unlock the device for the purpose of executing the search authorized by this warrant.

Attempting to unlock the relevant devices by these methods is necessary because the government

may not otherwise be able to access the data contained on those devices for the purpose of

executing the search authorized by this warrant. For this reason, Attachment B-1 and B-2

specifies that law enforcement agents are permitted to use **MAZEN's** and **YUSUF's** fingers,

face, or iris scan to unlock their associated devices.  This warrant seeks to permit law

enforcement to compel **MAZEN** and **YUSUF** to unlock Target Telephone 1 (**MAZEN**), Target

Telephone 2 (**YUSUF**), and other unknown devices in his possession, respectively, to the extent

they require biometric access.  The grounds for this request are as follows.

51.     I know from my training and experience, as well as from information found in

publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device

through biometric features in lieu of a numeric or alphanumeric passcode or password.  These

biometric features include fingerprint scanners, facial recognition features, and iris recognition

features.  Some devices offer a combination of these biometric features, and the user of such

devices can select which features they would like to utilize.

52.     If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints.  For example, Apple offers a feature called

"Touch ID," which allows a user to register up to five fingerprints that can unlock a device.

Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to

the device's Touch ID sensor, which is found in the round button (often referred to as the

"home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

53.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

54.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

55.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

56.     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that

29

biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for eight (8) hours and the passcode or password has not been entered in the last six (6) days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four (4) hours. Biometric features from other brands carry similar restrictions. Thus, the opportunity to unlock the device through a biometric feature may exist for only a short time.

57. Due to the foregoing, to the extent that **MAZEN's** and **YUSUF's** devices may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe **MAZEN's** and **YUSUF's** fingers (including thumbs) to the fingerprint scanner of the devices; (2) hold the device in front of **MAZEN's** and **YUSUF's** faces and activate the facial recognition feature; and/or (3) hold the device in front of **MAZEN's** and **YUSUF's** faces and activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to demand that **MAZEN** and **YUSUF** state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask **MAZEN** and **YUSUF** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

58. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

59.     <u>Forensic evidence</u>.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

60.     I know that when an individual uses an electronic device to conduct daily business, including sending messages and emails regarding invoices, the individual's electronic

device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

a. <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

b. <u>Manner of execution</u>. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **FINANCIAL INVESTIGATIONS BACKGROUND**

61. I know that the following categories of information and records are commonly found in fraud investigations like this one:

a. Communications between co-conspirators and others that discuss or otherwise show information regarding the acquisition and distribution of funds received from the Target Offenses or the proceeds of other fraud, including bank account information, commission payments, bank account set up instructions, individuals listed with access to bank accounts, method of deposits, acceptance from federal authorities, and information regarding individuals with ability and access to virtually deposit checks;

32

b. Communications between co-conspirators and others that discuss or otherwise show personal identifying information, names, routing numbers, bank account numbers, addresses, dollar amounts, Moneygram, Western Union, wiring instructions, pre-paid debit cards, or any other details related to financial accounts or financial transactions;

c. Financial records, including the following:

i. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, bank records, balance sheets, notes, and work papers;

ii. Correspondence, letters, memorandums, and statements, which contain financial information, such as the transfer of money from investors;

iii. Records of personal and living expenses, including receipts, invoices, airline tickets, and records of travel.

iv. Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Target Offenses.

d. I know from training and experience that such financial records are commonly found in fraud cases, because the object of fraud crimes is money, and that money must be moved, used, or transferred somehow.

e. The identity of the person(s) who utilized the device, including photographs (including but not limited to selfies) and any records containing personal identifying information (such PII helps determine the identity of the person using the device);

f. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

33

g. Records evidencing the use of the Internet Protocol addresses including:

    i. records of Internet Protocol addresses used;

    ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

h. I believe from the investigation that the digital devices were purchased online. When such purchases are made online, IP addresses are used. The IP address essentially acts as the electronic address of the person making the purchase.

## **CONCLUSION**

62. On the basis of my participation in this investigation and the information summarized above, there's probable cause to search the following:

a. **MAZEN**'s person (Attachment A-1);

b. **MAZEN's** residence, identified as **SUBJECT PREMISES 1** (Attachment A-2);

c. **YUSUF's** person (Attachment A-3); and

d. **YUSUF's** residence, identified as **SUBJECT PREMISES 2** (Attachment A-4).

63. There's probable cause that these people and places contain evidence, fruits, and instrumentalities of the TARGET OFFENSES.

64. In sum, **ABDULKADIR, HUSSEIN, OMAR, AHMED, MAZEN, YUSUF, ABUBAKAR,** and **ABDIRAHMAN** participated in a scheme to defraud Instacart and Shipt by taking over legitimate shopper's accounts, purchasing gift cards at retailers like Target, and then transferring those gift cards to cryptocurrency and cash.

65. The items listed in Attachment B are evidence of these crimes, contraband, or fruits of these crimes, or property that is or has been used as instrumentalities to commit the foregoing offenses. Therefore, I respectfully request that a warrant be issued that authorizes the

search of **MAZEN**'s person and **SUBJECT PREMISES 1**, further described in Attachments A-1 through A-2, and **YUSUF's** person and **SUBJECT PREMISES 2**, further described in Attachments A-3 through A-4, and the seizure of the records and items listed in Attachment B.

/S/ MEREDITH WILLIAMS
MEREDITH WILLIAMS
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this 8th day of August 2025. This application and warrant are to be filed under seal.

Kimberly A. Jolson
United States Magistrate Judge

35

## ATTACHMENT A-4

## PROPERTY TO BE SEARCHED

The premises to be searched is the property with the address 4985 Warner Road, Apartment 102, Westerville, OH 43081 (**SUBJECT PREMISES 2**), which is **YUSUF's** residence.



The search shall include all rooms and garages or storage spaces, attached or unattached, that are associated with **SUBJECT PREMISES 2** including any containers, locked or unlocked, located within or attached to **SUBJECT PREMISES 2** and any vehicles in the vicinity of **SUBJECT PREMISES 2** that **YUSUF** Ali possess keys to or over which **YUSUF** Ali maintains custody and control.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

The following items to be seized in whatever form (including digital) found on the person of YUSUF Ali described in Attachment A-3, and at the Property to be Searched described in Attachment A-4 ("**SUBJECT PREMISES 2**"), including digital devices, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud), 1349 (conspiracy), 1029 (Access Device Fraud), and 1956 (Money Laundering). These records and materials are more specifically described below.

     a.    Instacart;

     b.    Shipt;

     c.    Marqeta and Stripe Debit Cards;

     d.    Cryptocurrency Wallets and Seed phrases;

     e.    Cash;

     f.    Communications between co-conspirators and others that discuss or otherwise show information regarding the acquisition and distribution of funds received from the Target Offenses or the proceeds of other fraud, including bank account information, commission payments, bank account set up instructions, individuals listed with access to bank accounts, method of deposits, acceptance from federal authorities, and information regarding individuals with ability and access to virtually deposit checks;

     g.    Communications between co-conspirators and others that discuss or otherwise show personal identifying information, names, routing numbers, bank account numbers, addresses, dollar amounts, Moneygram, Western Union, wiring instructions, pre-paid debit cards, or any other details related to financial accounts or financial transactions;

     h.    Financial records, including the following:

          i.    Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, bank records, balance sheets, notes,

and work papers;

    ii.    Correspondence, letters, memorandums, and statements, which contain financial information, such as the transfer of money from investors;

    iii.    Records of personal and living expenses, including receipts, invoices, airline tickets, and records of travel.

    iv.    Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Target Offenses.

i.    The identity of the person(s) who utilized the digital devices, including photographs (including but not limited to selfies) and any records containing personal identifying information;

j.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

k.    Records evidencing the use of the Internet Protocol addresses including:

    i.    records of Internet Protocol addresses used;

    ii.    records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    iii.    For the search of this device and any other device seized pursuant to the warrant, law enforcement agents are authorized to (1) press or swipe YUSUF's fingers (including thumbs) to the fingerprint scanner of those devices; (2) hold the devices in front of YUSUF's face and activate the facial recognition feature; and/or (3) hold the devices in front of YUSUF's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this

warrant.  This warrant does not authorize law enforcement to demand that YUSUF state or otherwise provide the password or any other means that may be used to unlock or access the devices.  This warrant also does not authorize law enforcement to ask YUSUF to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

iv.  Law enforcement is also authorized to search this device and any other seized digital devices for the records and information identified above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.